**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ELBOW RIVER MARKETING**
**LIMITED PARTNERSHIP,**

    **Plaintiff,**

v.                                           **Case No. 8:10-cv-628-T-30AEP**

**CLEAN FUEL LAKELAND, LLC, et al.,**

    **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Plaintiff's Motion for Summary Judgment (Dkt. 18), Plaintiff's Supplement to same (Dkt. 26), and Defendants' Response in Opposition (Dkt. 33). The Court, having considered the motion, response, record evidence, and being otherwise advised in the premises, concludes that the motion should be granted in part and denied in part.

## BACKGROUND

This is a breach of contract action against Defendants Clean Fuel Lakeland, LLC ("Clean Fuel") and Lee J. Maher ("Maher"). Specifically, Plaintiff Elbow River Marketing Limited Partnership ("Elbow River") asserts claims against Clean Fuel and Maher based on their alleged defaults of a secured promissory note and personal guaranty, respectively. Elbow River is the holder of the note and guaranty by virtue of an assignment from World Energy Alternatives, LLC ("World Energy"), the original obligee.

On or about March 31, 2009, World Energy's subsidiary, Purada Processing, LLC ("Purada"), entered into an Asset Purchase Agreement with Clean Fuel and Maher, whereby Purada agreed to sell to Clean Fuel certain assets related to a biodiesel production facility. Under the Asset Purchase Agreement, Clean Fuel agreed to execute a Promissory Note in favor of World Energy. Also under the Asset Purchase Agreement, Clean Fuel agreed to execute a security agreement in favor of World Energy, and Maher agreed to execute a Continuing Unconditional Guaranty in favor of World Energy.

Clean Fuel executed the Promissory Note on April 15, 2009. The Promissory Note is in the face amount of $6,750,0000, which was to be paid in two installments. The first installment of $3,250,000 was to be paid to World Energy no later than December 31, 2009. The second installment of $3,500,000 was to be paid no later than December 31, 2010. The Promissory Note provides for acceleration of the entire unpaid principal sum upon a default for non-payment. It also provides for interest upon default.

Clean Fuel executed the Security Agreement on April 15, 2009 and Maher executed the Maher Personal Guaranty on or about April 28, 2009. The Maher Personal Guaranty provides that if Clean Fuel defaults in the payment or performance of its obligations, the obligations of Maher under the Maher Personal Guaranty shall become immediately due and payable upon proper written notice.

Under the Asset Purchase Agreement, the facility-related assets were sold in an "as is" condition. Specifically, section 3.4 of the Asset Purchase Agreement states in all caps:

> THE ASSETS ARE BEING SOLD TO BUYER BY SELLER IN AN "AS IS" CONDITION. SELLER EXPRESSLY DISCLAIMS, AND BUYER HEREBY EXPRESSLY WAIVES, ALL WARRANTIES RELATING TO THE ASSETS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND INFRINGEMENT.

The Asset Purchase Agreement also contains an integration clause in section 7.1 as follows:

> This Agreement, together with [its] schedules and exhibits, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the parties in connection therewith.

During the negotiations of the Asset Purchase Agreement, the record reflects that Larry Long ("Long"), Clean Fuel's President during the relevant time period, represented that Clean Fuel would need limited due diligence on the assets it was purchasing at the facility because Clean Fuel's team included Mitch Bishop ("Bishop"), who had previously worked for Purada, as the on-site Operations Manager at the facility.

Under the Asset Purchase Agreement, the closing was scheduled to occur on April 15, 2009. There is a disputed fact in the record as to whether Clean Fuel inspected the facility on April 15, 2009, prior to the closing. Nevertheless, the closing did occur on April 15, 2009. There is also no dispute in the record that prior to the closing, Clean Fuel inspected the facility during the weekend of March 14-15, 2009. E-mails between the parties dated March 18, 2009, discuss Clean Fuel's visit of the facility and issues related to the assets, such as the removal of the grease trap system and relining or replacing of other facility-related assets. Specifically, in discussing these issues, Long stated in an e-mail to Michael Laznik, World Energy's Chief Financial Officer:

> Now the short visit Saturday and Sunday has the unexpected additional $120k to $165k to remove and replace the grease trap system and reline or replace T1228 and T2122. I am sure after being idle for almost 2 years there is another $90 to $100k pushing the total over $1mill. for everything we want to do. We want a BQ 9000 plant that runs 24/7 and produces 20 million gallons a year not a glycerin plant that intermittently produces biodiesel.

(Dkt. 18, Ex. B; ERM001605).

The record also contains no dispute that in addition to agreeing to purchase the assets "as is," Clean Fuel agreed to waive any due diligence period. Specifically, although Clean Fuel requested a 10-day due diligence period during the negotiations, World Energy rejected this proposed revision, and the Asset Purchase Agreement contains no due diligence period or any other basis on which Clean Fuel could terminate the deal or obtain a price adjustment based on the condition of the assets.

On or about October 26, 2009, World Energy, on behalf of itself and its subsidiary Purada, entered into an Assignment Agreement, whereby World Energy assigned the Promissory Note, the Security Agreement, the Maher Personal Guaranty, and other related assets and rights to Elbow River. On or about November 16, 2009, World Energy provided notice to Clean Fuel and Maher of the assignment and advised Clean Fuel and Maher that all payments under the Promissory Note should be made to Elbow River.

Subsequently, on or about December 28, 2009, Elbow River sent a letter to Clean Fuel and Maher reminding them that the first payment under the Promissory Note was due on December 31, 2009, and providing wire transfer instructions.

It is undisputed in the record that Clean Fuel failed to make the first installment payment of $3,250,000 due under the Promissory Note on December 31, 2009, and anytime thereafter. It is also undisputed that Elbow River advised Clean Fuel and Maher of their defaults and the acceleration of the balance of the Promissory Note and the application of interest on same prior to filing this action.

Elbow River now moves for summary judgment on Counts I and II of its complaint for Clean Fuel's breach of the Promissory Note (Count I) and Maher's breach of the Maher Personal Guaranty (Count II).[1] Elbow River also moves for summary judgment on Defendants' affirmative defenses of fraudulent and negligent misrepresentation as well as setoff.

## DISCUSSION

### I.   Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[1] Elbow River originally moved for summary judgment on Count III of its complaint, which is a foreclosure claim, but notified the Court in its supplement (Dkt. 26), that it was withdrawing its summary judgment motion solely as to the foreclosure cause of action.

(1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## II.     Elbow River's Motion for Summary Judgment

The record is undisputed that Elbow River is entitled to summary judgment on Counts I and II of its complaint.  There is no dispute that Elbow River is the holder of the Promissory Note and that Clean Fuel failed to make the first installment payment of $3,250,000 by December 31, 2009.  The undisputed facts also show that Maher guaranteed timely payment and performance of all of Clean Fuel's obligations under the Promissory Note and failed to pay the amounts due after notice of Clean Fuel's default.

In its response, Defendants argue that Elbow River's motion does not address Defendants' claims that misrepresentations were made prior to the signing of the Asset Purchase Agreement related to the facility's regulatory compliance and its production capabilities, and that some of the assets listed under the Asset Purchase Agreement were not transferred to Clean Fuel.

With respect to Defendants' first argument regarding misrepresentations, the Court presumes that Elbow River did not address these claims because Defendants' affirmative defenses do not contain <u>any</u> facts related to alleged misrepresentations about the facility's production capabilities and regulatory compliance.  Rather, all of the facts in support of the affirmative defenses relate to false statements regarding the condition of the assets, which, as Elbow River points out and which Defendants appear to concede in their response, are contradicted by the "as is" clause and the integration clause contained in the Asset Purchase Agreement.

However, even if the Court were to consider these alleged misrepresentations, they are still contradicted by the clear language of the "as is" clause and the integration clause. Florida law is clear that reliance on an alleged misrepresentation is unreasonable as a matter of law where the alleged misrepresentation contradicts the express terms of the ensuing written agreement. *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007); *Mac-Gray Services, Inc. v. DeGeorge*, 913 So. 2d 630, 634 (Fla. 4th DCA 2005). And, here, any reliance on statements of whether the facility, which had been inactive for two years, was compliant with regulations and/or statements regarding the production capability, still relate to the overall condition of the assets. The "as is" clause makes it clear that all warranties "relating" to the assets are expressly waived. And the integration clause makes it clear that the Asset Purchase Agreement supersedes all prior agreements and "understandings" of the parties in connection therewith. Thus, any reliance on these alleged statements is unreasonable as a matter of law.

The Court does agree that there is a material issue of fact related to Defendants' second argument, i.e., whether World Energy delivered <u>all</u> of the assets listed in schedule 1.1 to the Asset Purchase Agreement. Long's declaration in support of Defendants' response states that a number of the assets were not at the facility and attaches schedule 1.1 with an indication of which assets are still missing. Accordingly, although the Court concludes that Elbow River is entitled to summary judgment on Counts I and II of its complaint and

Defendants' affirmative defenses regarding any misrepresentations or unclean hands, the Court will reserve on the amount of damages given the outstanding set off claim.[2]

It is therefore ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Summary Judgment (Dkt. 18) is hereby GRANTED in part and DENIED in part as set forth herein.

2. Plaintiff is entitled to summary judgment, as a matter of law, on Counts I and II of its complaint and on all of Defendants' affirmative defenses, other than the defense of set off related to assets contained on schedule 1.1 of the Asset Purchase Agreement that are missing from the facility.

3. The Court reserves jurisdiction on the issue of damages, including reasonable attorneys' fees and costs.

**DONE** and **ORDERED** in Tampa, Florida on December 16, 2010.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2010\10-cv-628.msjDkt18.frm

---

[2] To be clear, Defendants' claim for set off is the only defense asserted by Defendants that survives summary judgment.